**Fabien Penvern**
**Arbitrator | National Arbitration and Mediation**
**Member of the bars of Nice and Paris, France**
**SRA registered foreign lawyer, London, England**

**Offices:**
**19 rue de la Préfecture, 06300 Nice, France**
**120 rue d'Assas, 75006 Paris, France**
**60 Gresham Street, London EC2V 7BB, UK (RFL)**

**Tel: +33 (0) 4.93.91.91.11**
**Fax: +33 (0) 4.93.91.91.12**
**Email: fp@pnclegal.eu**

To the attention of:

**Claimant's Counsels:**
**Michael A. Winkleman, Esq.**
**Jason Margulies, Esq.**
**Carol Finklehoffe, Esq.**
Lipcon, Margulies & Winkleman
2 South Biscayne Blvd., Suite 1776
Miami, FL 33131
USA

By email to mwinkleman@lipcon.com
jmargulies@lipcon.com
cfinklehoffe@lipcon.com

**Respondent's Counsels:**
**Scott Mebane, Esq.**
**Lauren Levitt, Esq.**

Mase Mebane Seits
2601 S Bayshore Dr., Suite 800
Miami, FL 33133
USA

By email to smebane@maselaw.com
llevitt@maselaw.com

**Ms. Elisabeth Reid**
**Account Executive NAM**
990 Stewart Ave. First Floor
Garden City, N.Y. 11530
USA

By email to ereid@namadr.com

September 16, 2021

**Mr Stanko Mirkovich vs. Carnival Corporation**

**Re. NAM arbitration case n° 218.745**

**AWARD**

**I – APPOINTMENT, PROCEDURAL RULES AND PLACE OF ARBITRATION**

I have been appointed by National Arbitration and Mediation on November 29, 2018 to serve as sole arbitrator in the present matter initiated by Mr. Stanko Mirkovich (spelled "Mirkovikz" in the Seafarer's agreement), as claimant, against the company Carnival Corporation doing business as Carnival Cruise Line ("Carnival"), as respondent (together, the "Parties"). I declare that I am not in a position of conflict of interests and that I am in total independence to arbitrate this matter.

This matter is arbitrated under the Comprehensive Rules dispute resolution rules and procedures as adapted for seafarer/crew-member employment arbitrations (hereafter the « Comprehensive Rules »), by application of the provisions of article 9 of the Seafarer's Agreement concluded between Mr. Mirkovich and Carnival on January 13, 2018, also referred to in the appointment letter dated November 29, 2018.

The place of arbitration, by reference to the provisions of the article "Arbitration" of the Seafarer's Agreement and to the appointment of the arbitrator by the Parties, shall be Monaco or in the present case, as retained by both parties, Nice, France, where the Tribunal is located, as "closer to the Seafarer's home country", despite not amongst the places listed in the Seafarer's Agreement.

**II – PROCEDURAL HISTORY**

Claimant filed a Demand for arbitration on July 30, 2018, followed by his Statement of Claim.

Respondent filed a Reply and 21 affirmative defenses on September 14, 2018.

The Pre-hearing conference call was held on December 19, 2018.

Claimant filed a brief in support of the application of the Maritime law of the United States law as the substantive law applicable to this arbitration on January 25, 2019.

Respondent filed a Reply in support of the applicable choice of law, designating the Panamanian law as the only law applicable to this arbitration, on March 12, 2019.

The Ruling on applicable law rendered by this Tribunal on April 23, 2019 set that "the Panamanian laws are the substantive laws applicable to this arbitration case".

On May 17, 2019, this Tribunal rendered a Decision on Emergency Motion for maintenance and cure, considering that it was at the time premature to judge the question of Maintenance and Cure which could not be dissociated from the merits and medical elements and evidence.

On November 22, 2019, this Tribunal rendered a Decision on Claimant's Notice of Filing Supplement, admitting that the *Jankula v. Carnival Cruise Lines* decision as case law supporting Claimant's Claim, being specified that no binding force or particular authority of such case was, recognized over this Tribunal and arbitration procedure.

On December 10, 2019, this Tribunal rendered a Decision on Claimant's second request for production, partially accepted about value of daily shipboard benefits.

Thereafter, on the merits:

Claimant's Statement of Claim together with 23 Exhibits were submitted on September 24, 2019; 4 additional Exhibits were filed on April 19, 2020 and 2 additional Exhibits filed on July 16, 2021.

Respondent's Statement of Defense together with 11 Exhibits were submitted on March 9, 2020 and 2 additional Exhibits filed on July 13, 2021.

Medical records were received on March 11, 2020 and January 28, 2021, as Exhibits to the Statements of Claim and Defense.

The Final Hearing took place via Zoom videoconferencing, due to the difficulties for travelling and gathering during the Covid pandemic, organized by NAM on 14, 15, 16 and 19 July 2021.

A Court reporter, Mrs Guerlin Kelly Boyd of Jeannie Reporting, attended the Final Hearing and her transcription of the full Final Hearing was made available to the Parties, and to the Tribunal, on August 16, 2021.

Claimant filed a Post hearing brief on August 13, 2021, together with a Motion to strike the new opinions of Respondent's medical expert raised for the first time at the Final Hearing.

Respondent filed its Post-Hearing brief on August 16, 2021, and on August 20, 2021, filed a Response to Claimant's Motion to Strike and Motion to strike testimony and arguments made by Claimant.

Claimant responded by email on August 23, 2021.

These are the procedural elements of this arbitration procedure.


## III – WITNESSES AND PARTIES HEARD DURING THE FINAL HEARING

**Claimant called the following witnesses:**

- Mr Stefan Kotur

- Mrs Andela Vukcevic

- Mr Borislav Knezevic

- Dr. Howard Weiner

**Respondent called the following witnesses:**

- Dr. Kaia Calbeck

- Dr. Raymond Latanae Parker

**Additionally, oral testimonies as Parties to this Arbitration were provided during the Final Hearing by:**

- Mr Stanko Mirkovich

- Mr John Mitchell, as Carnival's Corporate Representative


## IV – ESSENTIAL FACTS OF THE DISPUTE, AS PRESENTED BY THE PARTIES

Mr Stanko Mirkovich is a Macedonian national born on January 8, 1992 in Skopje (currently Republic of North Macedonia).

Under a Seafarer's Agreement signed with Carnival on January 13, 2018, he worked as Hotel Steward onboard the vessel *Carnival Horizon*, a Panamanian flagged vessel. This was his fourth contract with Carnival.

Prior to boarding the vessel, on or about January 13, 2018, Claimant underwent a pre-employment physical examination according to which he was "fit for duty without restrictions".

Claimant joined the vessel while it was still under construction at the Fincantieri shipyard in Trieste, Italy. At this time, the vessel *Carnival Horizon* was docked. It was not sailing and guests were not attending. Carnival was not conducting nor supervising the works at the shipyard directly, but was relying on Fincantieri to do so.

At the shipyard, Mr. Mirkovich did not perform the duties of hotel steward in the presence of passengers, but instead worked alongside shipyard employees, including but not limited to welders, electricians, painters, plumbers, and carpenters.

More precisely, Mr. Mirkovich was assigned to assist in manually loading provisions aboard the vessel, storing provisions, setting up passenger and crew cabins as well as various cleaning duties:

- rip/untie all protections from lounge chairs, secure them and prepare them to be loaded/stored in an open warehouse located at the shipyard;
- wait in the elements on open decks as cranes brought containers with supply boxes.
- unpack boxes using a cutter and arrange bedding supplies and to load tables and chairs into passenger cabins;
- dust and clean crew cabins including moving mattress and dusting bedframes;
- unpack boxes with bedding supplies and makeup crew cabins;
- transport palettes of supplies (laundry, chemicals, spas) with a pump truck from aft gangway to forward gangway;
- arrange the boxes and supplies in the main laundry linen room;
- arranging furniture and shelfing in the housekeeping managers office;
- clean the offices of Carnival's ship managers located in the shipyard.

Respondent states that personal protective equipment ("PPE"), including dust masks, winter jackets, gloves, goggles, and helmets were made available to all crew members, including Claimant. If at any time a crew member's PPE was damaged or lost, it would be replaced immediately.

Mr. Mirkovich acknowledges that he was at the inception of his work provided with safety shoes and a jacket, but not with facemasks.

While carrying out his assigned duties, Mr. Mirkovich states that he was repeatedly exposed to the elements cold, wet, wind, and rain, with temperatures between the low 30s and high 40s (Fahrenheit).

Within weeks, Mr. Mirkovich developed a sore throat, headache, fever and began to experience difficulty breathing. He reported his condition to his manager and was sent to see a nurse at the medical center in the shipyard. Mr. Mirkovich was diagnosed with a viral infection, provided with antibiotics and told to rest.

As his condition did not improve, Mr. Mirkovich was seen at the local hospital on February 9, 2018, there he was diagnosed with acute bacterial pharyngitis in flu syndrome. He was prescribed additional medication and told to rest.

On February 16, 2018, he returned to the local hospital with no improvement in his condition. He was given medication and told to rest.

Around this time Carnival's shipboard medical team arrived at the shipyard and came to see Mr. Mirkovich in his room.

Mr. Mirkovich continued to worked for almost a week before he was finally provided with a facemask. However, by this time his symptoms had worsened, he had a high fever, headaches, difficulty breathing and swallowing, stomach and gastrological problems and episodes of vomiting.

On February 27, 2018, Mr. Mirkovich was sent back to the hospital. He was noted to have enlarged lymph nodes, and pharyngitis resistant to antibiotics. He was then declared unfit for duty and was repatriated home for further medical care.

Mr. Mirkovich was sent home, in Macedonia, on March 1, 2018, suffering labored (heavy) and wheezing breathing, a very severe cough and ongoing gastrological issues. He was also suffering anxiety related to his ongoing poor medical condition.

Carnival made arrangements for Claimant to travel home. Carnival also coordinated Claimant's at home treatment with Thomas Miller Claims Management. Thomas Miller Claims Management "is the largest provider of 'back to work' case management for the marine sector" and specializes in arranging medical treatment local to employees.

4

On March 12, 2018, twelve days after his arrival home, Carnival finally arranged for Mr. Mirkovich to be seen by a medical provider. Dr. Aleksander Lazarevski (ENT) noted he had "edema of the nasal mucosa and heavier postnasal secretion" and diagnosed him with acute nasopharyngitis.

Dr. Oliver Jovkovski (pulmonologist) observed Mr. Mirkovich had loud crepitations bilaterally. Spirometry testing confirmed reduced capacity in the small airways. Dr. Jovkovski diagnosed allergic rhinitis and other respiratory disease. For the first time in his life, Mr. Mirkovich was required to use an inhaler. He was provided with additional medication and a methacholine test (bronchial provocation test) was ordered.

When Mr. Mirkovich returned to Dr. Jovkovski on April 2, 2018, with complaints of heavy breathing, wheezing in chest, cough, clogged nose and secretion in the nose. Spirometry testing showed a worsening of his condition with lowered ventilation function and auscultation findings positive for large wet crepitations on right basal side, and a positive finding for asthma.

Respondent considered that Claimant was deemed to be at Maximum Medical Improvement ("MMI"), on April 2, 2018, and was advised to avoid dust. Carnival paid for Claimant's treatment until he was at MMI. Claimant refutes he reached MMI at that date.

On April 10, 2018 Mr. Mirkovich saw Dr. Borislav Gogushevski for a specialist ORL examination with endoscopy. He was diagnosed with chronic tonsillitis and candidiasis linguae, and acute rhinitis.

Mr. Mirkovich was given additional medication and referred for a gastroscopy. A gastrologist, Dr. Dinitar Trajkov, diagnosed dyspepsia, a known side effect of antibiotics.

On April 23, 2018, Mr. Mirkovich returned to Dr. Jovkovski. Testing, again showed lowered lung capacity and lowered flow in the small airways. He was diagnosed with asthma, allergic rhinitis and other respiratory disease.

Mr. Mirkovich explains that he lost 15 kilograms by April, 2018, was very weak and had difficulty climbing the stairs to his apartment. The anxiety he had previously been experiencing was so severe he suffered panic attacks and confined himself to his home. For this he sought care from Dr. Borislav Knezevic, a psychologist. Dr. Knezevic found that Mr. Mirkovich suffered anxiety, depression, with psychosomatic reactions, including asthma, burns, stomach pain, heart palpitations, inorganic insomnia and migraines. The doctor stated that Mr. Mirkovich required "urgent psychological and psychotherapeutic treatment."

On June 13, 2018, Mr. Mirkovich was admitted to the hospital where he underwent a tonsillectomy. He was hospitalized for two days.

Mr. Mirkovich was next seen by Dr. Lirim Demiri, an ENT specialist. Examination found white plaque on the tongue, swelling of the nasal structure with serious secretion in the nasal cavities. He was diagnosed with allergic rhinitis and prescribed medication.

On August 1, 2018, Dr. Jovkovski issued a medical status report again confirming the diagnosis of allergic rhinitis, respiratory disease and asthma. The doctor indicated he would require lifelong medication for these symptoms and he was not fit to return to work activities that expose him to dust.

Thereafter, Carnival terminated Mr. Mirkovich's maintenance and cure benefits.

On August 9, 2018, Mr. Mirkovich was evaluated by Dr. Sonja Nevistikj. She noted that Mr. Mirkovich had a low mood, prone to crying, tense, anxious often to the level of panic attacks accompanied by intense vegetative symptoms, loss of appetite, disturbed sleep and frequent insomnia. She indicated that treatment was required and prescribed medication.

Mr. Mirkovich continued to treat with Dr. Knezevic for his significant ongoing psychological problems. On August 28, 2018, he was hospitalized for depressive thoughts and self-destructive episodes along with anxiety and panic attacks.

Mr. Mirkovich then borrowed money and sought an appointment with Dr. Novak Vocode, an otorhinolaryngology specialist. He was seen on October 27, 2018, and found him to have swollen and enlarge mucous sinus.

Additional medication was prescribed and he was referred to a pulmonologist, Dr. Dusica Jaric. confirmed bronchial provocation and verified bronchial obstruction with positive BD test and additional medications were prescribed.

On February 25, 2019, again after borrowing money, Mr. Mirkovich was hospitalized at Sava Surgery.

At that time, he had hypertrophic nasal cavities and was diagnosed with rhinitis hyperplastic. Under general anesthesia, radiotherapy surgery was performed in an attempt to treat and shrink his conchae nasal cavity. Unfortunately, the procedure did not resolve or improve his symptoms.

On June 24, 2019, Mr. Mirkovich was seen by pulmonologist, Dr. Goran Jankovic. On examination he noted that Mr. Mirkovich had "high-pitched whistling sound, diffused." He prescribed additional medication. The doctor also noted that for purpose of pulmonary rehabilitation, Mr. Mirkovich needed to remain in favorable weather conditions.

At this time, Mr. Mirkovich was also seen by Dr. Milan Stankovic, an otorhinolaryngology specialist, who prescribed additional medication.

As of July, 16, 2019, his diagnosis included major depressive disorder, social phobias, social anxiety disorder, mixed anxiety and depressive disorder, post-traumatic stress disorder and adjustment disorder. Dr. Knezevic found that all of Mr. Mirkovich's psychological conditions are a direct result of his physical symptoms and loss of his life as he once knew it.

As of September, 2019, Dr. Knezevic diagnosed post-traumatic stress disorder, mixed depression and anxiety, panic attack and social phobias. He concluded that Mr. Mirkovich has not reached Maximum Medical Improvement from a psychological standpoint. He will require significant ongoing and future psychological, psychiatric, psychotherapy treatments and medications.

During the Final hearing, Mr Mirkovich was still in the premises of Dr. Knezevic and could provide his testimony and attend the full Final Hearing from these facilities, located in Serbia.

Claimant alleges that Respondent failed to provide all the recommended care and that Claimant's ongoing complaints demonstrate that he is not at maximum medical improvement (MMI).

Respondent, in its defense, denies being responsible for Claimant's claimed injury or condition and asserts having in any event provided him with medical care until he reached maximum recovery.

The details of such Claim and Defense, their legal grounding and arguments developed by both Parties are detailed hereunder.


## V – GROUND, SCOPE AND EXTENT OF THE PRESENT AWARD

This Final Award is based on the NAM Comprehensive Rules (Rules 2E, 31, 32 and 33) and on the legal and factual arguments presented by the Parties in their Full Statements of Claim and Defense.

It establishes the final rights and obligations of the Parties and is binding on them. A judgment may be entered for enforcement in a public court pursuant to the rules of the relevant jurisdiction for enforcement of arbitral awards.

**VI – ARCHITECTURE OF THE POSITION OF THE PARTIES ON THE MERITS**

**Claimant's Claim and argumentation are structured as follows in his Full Statement of Claim filed on 24 September 2019:**

> *Introduction*
> *Factual Background and the Incident*
> *Damages*
> *Allowable Damages*
> *Damages Suffered*
> *Lost Wages and Future Earnings*
> *Pain, Suffering, Mental Anguish and Moral Damages*
> *Medical Expenses*
> *Liability*
> *(a) Panamanian Law*
> *Contractual Liability*
> *Tort Liability*
> *(b) U.S. General Maritime Law*
> *Jones Act*
> *Failure to Provide Maintenance & Cure*
> *Punitive Damages for Refusal to Provide Maintenance and Cure*
> *Failure to treat*
> *Damages Pursuant to U.S. General Maritime Law*
> *Damage summary*

**Claimant structured the additional argumentation of his post-hearing Brief filed on August 13, 2021, as follows:**

> I. *Introduction*
> II. *Evidence Presented at Final Hearing & By Written Submission*
>     1. *Mr. Mirkovich's Life and Employment with Carnival Before Becoming Ill*
>     2. *The Shipyard and Carnival Horizon*
>     3. *Claimant's Condition and Treatment Upon His Return Home*
>     4. *Abandonment by Carnival*
>     5. *Claimant is NOT at MMI, he Requires Further Curative Care and his Condition is Causally Related to his Employment with Carnival*
>         i. *Causal Connection of Claimant's Physical Complaints*
>         ii. *Causal Connection with Psychological Complaint*
> III. *Law and Duty Owed to Claimant*
>     1. *Panamanian Law*
>     2. *US Maritime Law*
> IV. *Damages*
>     1. *Panamanian Law*
>     2. *US Maritime Law*
> V. *Conclusion*

**Respondent structured the argumentation of its Statement of Defense filed on March 9, 2020 under the following headings:**

> *Introduction*
> *Evidence*
> *1. Carnival provided Claimant assistance in accordance with Panamanian law.*
> *2. Claimant is not entitled to Recovery under Panamanian labor law because he did not suffer his complained-of injuries as a result of an occupational accident.*
> *3. There is no tort liability under Panamanian law because Carnival acted reasonably in providing Claimant with Personal Protective Equipment at all times and provided prompt and proper medical care after Claimant's onset of cold systems.*
> *4. Plaintiff is not entitled to punitive or moral damages.*
> *5. Claimant failed to mitigate his damages.*
> *Conclusion*

**Respondent presented additional argumentation in its post-hearing Brief filed on August 20, 2021, under the following headings:**

> *Introduction*
> *Contractual Claim*
> *a. Carnival paid for Claimant's respiratory treatment until he was considered at Maximum Medical Improvement.*
> *b. Carnival met its obligation for repatriation costs and sick wages.*
> *c. Claimant's alleged psychological claim is not an occupational illness because it did not arise while he was working onboard the vessel.*
> *d. Pursuant to Executive Decree Article Four, if Claimant is entitled to disability, he would only be entitled to 30% of his yearly salary.*
> *Negligent (Tort) Claim*
> *a. Claimant fails to prove causation as to his respiratory claim.*
> *b. Claimant fails to prove causation as to his psychological claim.*
> *Law and Evidence Regarding Damages*
> *a. Claimant is not entitled to costs for treatment related to a non-occupational illness.*
> *b. Claimant is not entitled to costs for palliative respiratory treatment.*
> *c. Claimant's Claim for Lost Wages and Living Expenses*
> *d. If liability is found, Carnival would only be required to pay for the time period in which Claimant would be fit for duty.*
> *e. Comparative Negligent and the Duty to Mitigate*
> *f. Attorneys' fees and punitive damages are unwarranted.*
> *Conclusion*

## VII – MONETARY CLAIMS FORMED BY MR MIRKOVICH

From Claimant's post-hearing Brief filed on August 13, 2021 (with amounts adjusted since the Full Statement of Claim filed on 24 September 2019)

**Summary of Damages claimed by Mr Mirkovich pursuant to Panamanian Law:**

| | |
|---|---|
| LOST EARNINGS IN THE PAST | $    45,507.00 |
| LOST EARNINGS IN THE FUTURE (RANGE FROM $859,032 TO $1,379,032) | $1,379,032.00 |
| PAIN & SUFFERING, DISABILITY, ETC. IN THE PAST | $   100,000.00 |
| PAIN & SUFFERING, DISABILITY, ETC. IN THE FUTURE | $   470,000.00 |
| PAST MEDICAL EXPENSES ($20,153.71 + $101,121.44) | $   121,275.15 |
| FUTURE MEDICAL EXPENSES | $1,410,000.00 |
| MORAL DAMAGES FOR FAILURE TO PROVIDE MAINTENANCE AND CURE | $   570,000.00 |
| **TOTAL** | **$4,095,814.15** |

**Summary of Damages claimed by Mr Mirkovich pursuant to U.S. Law**

| | |
|---|---|
| LOST EARNINGS IN THE PAST | $   45,507.00 |
| LOST EARNINGS IN THE FUTURE (RANGE FROM $859,032 TO $1,379,032) | $1,379,032.00 |
| PAIN & SUFFERING, DISABILITY, ETC. IN THE PAST | $   100,000.00 |
| PAIN & SUFFERING, DISABILITY, ETC. IN THE FUTURE | $   470,000.00 |
| PAST MEDICAL EXPENSES ($20,153.71 + $101,121.44) | $   121,275.15 |
| FUTURE MEDICAL EXPENSES | $1,410,000.00 |
| SUBTOTAL OF COMPENSATORY DAMAGES | $3,525,814.15 |
| *PUNITIVE DAMAGES* | *$3,525,814.15* |
| **TOTAL** | **$7,051,628.30** |

## VIII – APPLICABLE LAW

By Ruling on applicable law rendered on April 23, 2019, the Tribunal ruled and directed that the Panamanian laws are the substantive laws applicable to this arbitration case.

The analysis of the Claimant and Respondent's argumentation takes place under the prism of the Panamanian laws, of which a preliminary presentation is made hereunder.

Claimant also formed, in his Full Statement of Claim and Post-hearing Brief, claims under laws of the United States of America, which are not deemed applicable to this case by the Tribunal.

### A – Legal provisions under Panamanian Laws

This Tribunal relies on the Panamanian laws as presented by the Parties. To that regard, both Parties have elaborated in the Full Statements of Claim and Defense their arguments under Panamanian Contractual Liability derived from the Executive Decree n°86 on the one hand, and under Panamanian Tort Liability based on the Panamanian Civil Code on the other hand.

The two sets of laws identified as relevant to this case read as follows:

**1)  Panamanian Contractual Liability**

The Executive Law Decree n°86 of February 22, 2013 transposing into Panamanian laws the Maritime Labour Convention, 2006, provides:

Article 5: All Shipowners of vessels with Panamanian registration shall ensure equity of life and work conditions for both nationals as well as foreigners who work on board the vessels.

Article 7: In case of conflict between two parties regarding the applicability or interpretation of regulatory or supplementary provisions or in International Conventions, the provision or interpretation most favorable to seafarers shall prevail.

CHAPTER II
SHIPOWNERS' LIABILITIES IN THE EVENT OF SEAFARERS' OCCUPATIONAL ACCIDENTS, INJURIES OR DEATH

Article 170: Shipowners shall be responsible for protecting the health of, and providing medical care to, all Seafarers who render services on board their vessels.

Article 171: Shipowners must bear the costs of illnesses or accidents of all Seafarers employed in their vessel occurred between the date of initiating service and the date considered as the date when Seafarers have been duly repatriated, or that derive from the employment carried out between those dates.

Article 172: Shipowners must provide insurance coverage in order to guarantee the payment of an indemnity in the event of death or long-term disability of Seafarers, as a result of a work accident, illness or occupational risk.

Article 173: Shipowners must bear, directly or through an insurance, the expenses for medical care, including any medical treatment, surgery, hospitalization, necessary medicines and therapeutic devices, as well as accomodation and food away from home until recuperation of ill or injured Seafarers, or until the permanent nature of the illness or disability has been proven.

Article 174: Shipowners must bear all funeral costs in the event of death onboard or ashore during the employment period.

Article 175: The Shipowner's liability with regards to medical care expenses, hospitalization, accomodation and food shall extend for sixteen (16) weeks as of the date on which the injury took place or the start of the illness.

Article 176: When the illness or injury incapacitates a Crewmember for work, the Shipowner must pay the totality of the wage while the ill or injured Seafarer is onboard, or until recovery, if occurred first. Benefits may be excluded from this payment.

Article 177: Shipowners shall be exempted from all liability in the following events:

1. When the injury has not occurred as a result of service on the vessel.
2. When the injury or illness is attributed to the deliberate, improper conduct of the ill, injured or deceased Seafarer.
3. When the illness or physical deficiency are intentionally hidden at the time of employment.

Article 178: For the purposes of applying this Executive Decree, the following shall not be considered work accidents:

1. An accident deliberately caused by the Seafarer.
2. An accident caused by the Seafarer's negligence, being considered as such a verified disobedience to an expressed order, the culpable or obvious non-compliance with the rules for the prevention of accidents and safety, voluntary drunkenness, and the use of illicit drugs.

Article 179: Shipowners shall take all necessary measures to protect the belongings left onboard by the ill, injured or deceased Crewmember.

CHAPTER III PROTECTION OF SAFETY AND HEALTH AND PREVENTION OF ACCIDENTS

Article 180: It is the Shipowner's obligation to adopt effective safety and health policies and programs at work, including an evaluation of risk, as well as training and education of Seafarers, with the purpose of preventing work accidents, professional injuries or illnesses, including measures to reduce and prevent the risk of exposure on damaging levels to environmental factors and chemical substances, as well as the risk of injuries or illnesses that may derive from the use of equipment and machinery onboard the vessel.

Article 181: Shipowners must be under the obligation to provide Seafarers with protective equipment and other devices for the prevention of accidents, together with rules for the use of said protection equipment or devices.

Article 182: Shipowners must be under the obligation to ensure that machinery used onboard is properly protected, and to ban the use of machinery that lack the adequate protection devices.

Article 183: Vessels that have at least five Seafarers on board must create a Safety Committee comprised by Crewmembers.

The Safety Committee must ensure the continuous improvement of protection and health at work, taking into consideration preventive measures that include the control of engineering and design, the use of the personal protection equipment, as well as the requirements for inspecting, notifying and correcting any unsafe conditions and investigating and notifying any work accidents onboard.

Article 185: Shipowners must be under the obligation to report the occurrence of any work accident to the Competent Authority, as well as any injuries and occupational illnesses in a proper manner, taking into consideration the guidelines provided by the International Labour Organization with regards to notification and recording of work accidents and occupational illnesses.

**Panamanian Tort Liability**

Article 1644 of the Panamanian Civil Code states:

> "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.
> Si la acción u omisión fuere imputable a dos o más personas, cada una de ellas será solidariamente responsable por los perjuicios causados."

Which translates as follows:

> "Whoever, by action or omission, causes damage to another, by fault or negligence, is obliged to repair the damage caused.
>
> If the action or omission is attributable to two or more people, each of them will be jointly and severally liable for the damages caused."

Article 1645 al. 1 states:

> " La obligación que impone el Artículo 1644 es exigible no sólo por los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder."

Which translates as follows:

> "The obligation imposed by Article 1644 is exigible not only for one's acts or omissions but for the persons for whom one must respond."

**For Claimant,** the laws of the Republic of Panama contemplate general and special damages. The first are named "material damages" and the second "moral damages" respectively. Material damages include past and future damages for the value loss, lost earnings and loss of earning capacity, medical expenses, as well as pain and suffering and mental distress. Moral damages include the consequence to private life, physical appearance, or the respect that others have of that person. Factors in determining damages include the age of the claimant and his work life expectancy (to age 65), his life expectancy (to age 76), his income and increases and promotions. Panamanian law also guarantees payment of an indemnity for long-term disability as a result of a work accident, illness or occupational risk. [Exhibit 17– Declaration of Attorney Francisco Carreira-Pitti]

**For Respondent,** the seafarer has a labor/contractual action against the shipowner pursuant to the Maritime Labor Convention as enacted in Panama. Panama has adopted and implemented the Maritime Labor Convention into its domestic laws through Executive Decree n° 86. All labor/contractual actions against a shipowner like Carnival are regulated by Executive Decree n°86. Second, a seafarer has a "tort" action against the shipowner under the Panama Civil Code if he can prove that his injury or illness was caused by the fault of the shipowner. Claimant is not entitled to recovery under any theory.

The mechanics of these legal basis and their articulation with the facts shall be discussed at X below.

**B – US Laws are outside the scope of this Arbitration**

As per the Ruling on applicable law rendered on April 23, 2019 ("In light of the above, I rule and direct that the Panamanian laws are the substantive laws applicable to this arbitration case"), the developments under US Laws made by Claimant are not admitted before this Tribunal which will solely retains and applies the Panamanian laws.

**IX – PERIMETER OF THE LEGAL AND FACTUAL ARGUMENTS RETAINED FOR THIS AWARD**

Concomitantly to this Award is rendered by the same Tribunal a Ruling on Claimant's and Respondent's Motions to Strike:

- reminding that the opinions, ideas and arguments expressed during the Final Hearing, and also in the post-hearing Briefs, are received to nurture the discussions, give precisions or cast light on arguments priorily exchanged in the scope of an adversarial procedure;
- expressing that in all events the Tribunal will not render its decision on legal groundings, arguments and facts that have not been expressed, or rooted in the Full Statement of Claim and Full Statement of Defense;
- considering that Respondent's Exhibits n°12 (Psychological evaluation of Dr Calbeck dated 07/05/21) and n°13 (Opinion of Dr R. Latanae Parker dated 02/21/2020), and Claimant's Medical Chronology being a descriptive document, are not unfairly bringing new developments, they have been accepted despite their tardiness.
- Considering that  like for Dr Parker's new opinions, the supplement to Exhibit 17 entitled Supplemental Declaration of Francisco Carreira-Pitti has deeper legal implications (it is actually bringing additional claims under additional legal basis).

This Tribunal concluded and ruled that:

- Dr Raymond Latanae Parker's new opinions emitted during his witness statement at the Final Hearing on 16 July 2021 and included in Respondent's Exhibit 13 are stricken.
- Respondent's request to strike portions of Claimant's testimony is denied.
- Claimant's arguments made pursuant to U.S. General Maritime Law will not be retained by this Tribunal.
- Claimant's new Exhibit "Supplemental to Exhibit 17 entitled Supplemental Declaration of Francisco Carreira-Pitti" is stricken.

Consequently, the perimeter of the exchange of legal and factual arguments by the Parties is adjusted to take into account the above-mentioned Ruling.

**X – DISCUSSION**

The discussion will follow the dichotomy of Claimant's Claims under Panamanian laws, revolving around the Executive Law Decree No.86 of February 22, 2013 on the one hand, Articles 1644 and 1645 of the Panamanian Civil Code on the other hand.

For each Claim will be exposed the substance of Claimant's reasoning as well as Respondent's arguments in defense, followed by the analysis, motivations and conclusions of the Tribunal, leading to the Award expressed under the title XI – Award, below.

1) **As a preliminary decision, on the fact that Mr Mirkovich worked for Carnival at the Fincantieri shipyard in Trieste, Italy**

Mr Mirkovich worked for Carnival at the Fincantieri shipyard in Trieste, Italy, under the supervision of, mainly, employees or contractors of Fincantieri and sometimes of Carnival's employees or coordinators reporting to Carnival (see page 3 of Claimant's Post-Hearing Brief "Linda Lizer, specifically told crewmembers they did not need masks").

Such work took place under the Seafarer's agreement signed by Carnival and Mr Mirkovich on 13 January 2018.

These aspects are not developed in the Parties' writings but have been discussed during the Final Hearing, under the light of:

On the one hand, Article 1645 al. 1 of the Panamanian Civil Code, stating ""The obligation imposed by Article 1644 is exigible not only for one's acts or omissions but for the persons for whom one must respond."

On the other hand, the provisions of article 3L of the Seafarer's agreement, referring to a special regime called "Comandata", providing:

> "The parties acknowledge and agree that should the assigned vessel be under construction at a shipyard and until the vessel starts navigation, Seafarer may be required to work on "comandata" regime on board of such vessel for all the duration of the construction operations or for a different term as indicated by CCL from time to time. During the "comandata" regime period, Seafarer shall perform his/her shipboard duty with the aim of familiarizing with the vessel's facilities and organization. For all the duration of the "comandata" regime, Seafarer will be subject to the same terms and conditions of employment provided in this Agreement. If the Seafarer's scheduled work assignment falls during a wet dock or dry dock, Seafarer may be signed off the assigned vessel prior to said wet dock/dry dock and, if so, will not be under CCL's employ during said periods of time. If the Seafarer remains on the vessel during said periods, he/she does so either as a business invitee or under the "comandata" regime as specified above until the vessel is returned to navigation"

The conclusion, retained by this Tribunal, being that the Fincantieri shipyard is acting on behalf of Carnival for the employment matter at stake, and that Carnival retains the associated potential employer's responsibility. Moreover, in all events, Carnival at all times retains the capacity as Shipowner.

## 2)  Carnival's potential liability under the Executive Law Decree No.86 of February 22, 2013

**A – In Law**

Claimant's position

In his legal opinion (Exhibit 17), Attorney Francisco Carreira-Pitti explains that irrespectively of a fault of the employer, an employee is entitled to claim the application of Articles 170, 172, 175, 180 and 181 of the Panamanian Executive Decree n°86, leading to the indemnification of:

> - the costs of illnesses or accidents of all Seafarers employed in their vessel occurred between the date of initiating service and the date considered as the date when Seafarers have been duly repatriated (Article 170)

> - an insurance coverage in order to guarantee the payment of an indemnity in the event of death or long-term disability of Seafarers, as a result of a work accident, illness or occupational risk (Article 172)

> - directly or through an insurance, the expenses for medical care, including any medical treatment, surgery, hospitalization, necessary medicines and therapeutic devices, as well as accommodation and food away from home until recuperation of ill or injured Seafarers, or until the permanent nature of the illness or disability has been proven (Article 173)

> Being specified at Article 175 that the Shipowner's liability with regards to medical care expenses, hospitalization, accommodation and food shall extend for sixteen (16) weeks as of the date on which the injury took place or the start of the illness.

To that regard, Claimant brings forward through the legal opinion of Attorney Francisco Carreira-Pitti that The Supreme Court of Panama has determined that the Constitutional Provision protecting

labor rights and declaring null and void any waiver thereof is to affect the limitation of medical care and expenses to 16 weeks since the MMI is a standard more favorable to the seafarer. This opinion is not contradicted by Respondent.

- When the illness or injury incapacitates a Crewmember for work, the Shipowner must pay the totality of the wage while the ill or injured Seafarer is onboard, or until recovery, if occurred first. Benefits may be excluded from this payment (Article 176)

As for the duties of the Shipowner, it is the Shipowner's obligation to adopt effective safety and health policies and programs at work, including an evaluation of risk, as well as training and education of Seafarers, with the purpose of preventing work accidents, professional injuries or illnesses, including measures to reduce and prevent the risk of exposure on damaging levels to environmental factors and chemical substances, as well as the risk of injuries or illnesses that may derive from the use of equipment and machinery onboard the vessel (Article 180)

Furthermore, shipowners must be under the obligation to provide Seafarers with protective equipment and other devices for the prevention of accidents, together with rules for the use of said protection equipment or devices (Article 181).

Respondent's position

In its writings, Carnival does not dispute the applicability to this case of such entitlement of the Seafarer, irrespectively of a fault of the employer, or even of a causation, save for the extension of an indemnification of Article 173 beyond 16 weeks that is disputed by Respondent.

Carnival is of the opinion that its obligation to cover Claimant's medical expenses was limited to: (1) his occupation illness that arose while he was working onboard the vessel, (2) medical treatment until he was deemed MMI (or 16 weeks from the date of his injury), and (3) curative treatment. Those obligations were met. When Claimant requested Carnival cover medical costs for a tonsillectomy and gastroscopy, Carnival paid those costs too, beyond its obligation.

Additionally, Carnival had an obligation to pay Claimant's repatriation costs and 16 weeks of sick wages. Carnival did both. Carnival paid Claimant's travel home to Macedonia after disembarking the vessel. Carnival paid Claimant's wages from February 9, 2018, when he first fell ill and took approximately 20 days off from work, until June 21, 2018, after he was back home. [Respondent's Exhibit No. 10; Respondent's Composite Exhibit No. 8, p. 16-17]. Carnival paid 112 days (16 weeks) of sick wages. [*See* Respondent's Exhibit No. 11].

About the indemnification regardless of a fault, Respondent argues that Claimant's alleged psychological injury is not an occupational illness. It did not arise while Claimant was working onboard the vessel. There were no complaints of any psychological ailment while Claimant was onboard the vessel. Even after Claimant signed off the vessel, correspondence to Carnival for payment of medical care was limited to his respiratory ailments. Carnival received a Notice of Representation from Claimant's counsel on April 9, 2018. Claimant's first psychological evaluation was on April 11, 2018, after retaining attorneys.

Carnival requested, if the Tribunal determines Claimant is entitled to disability, that Claimant receives not more than 30% of his yearly salary, "Pursuant to Article Four". However, the Tribunal could not find the text of such article four nor a precise reference enabling the Tribunal to identify it.

**B – In fact**

The facts deemed relevant under the Executive Decree n°86 are the following:

**Health of Mr Mirkovich prior to joining the *Carnival Horizon* and first symptoms**

Mr Mirkovich joined the *Carnival Horizon* on January 13, 2018.

On February 13, 2017, just eleven (11) months before joining the *Carnival Horizon*, Mr. Mirkovich underwent a Seafarers Medical Fitness Examination and was issued a Seafarer Medical Certificate. He was declared "Fit For Service" with no restrictions.

His Seafarer Medical Certificate confirmed he had no restrictions, required no prescription medication, he had no rhinitis or nasal defects, no tonsillitis, no asthma, no trouble breathing, no gastrological issues and no psychological issues.

Prior to joining Carnival and during the course of his employment, Claimant underwent multiple Pre-Employment Medical Evaluations ("PEME") and Re-Employment Medical Evaluations ("REME"). Each evaluation consisted of a "full physical evaluation" and was found fit for duty without any limitations and his chest x-rays were normal. His last REME was conducted on February 13, 2017, less than a year before he joined the Horizon at the shipyard.

Between February 13, 2017 and October 16, 2017, Mr. Mirkovich was seen at the ship's infirmary several times for unrelated ailments. Each and every time his lung and respiratory system was found to normal, non-labored and clear without wheezes or diminished breath.

However, as Respondent pointed out, Mr Mirkovich had prior condition medically documented: he suffered from an upper respiratory infection in March 2017.

This being said, Mr Mirkovich showed symptoms of illness while onboard the Carnival Horizon at the Fincantieri shipyard in Trieste.

As Respondent has stated itself, a few weeks after signing onto the ship, Claimant complained that he did not feel well. Immediately, Claimant was sent for medical care. Claimant's symptoms did not get better and on February 9, 2018, Carnival sent Claimant to the emergency room at Hospital Mestre del Angel. Claimant was diagnosed with tonsillitis. He was given time off work, until February 21, 2018, to recover from his symptoms. During that time, a nurse regularly visited Claimant at his hotel to ensure he was recovering appropriately and feeling better. About a week after Claimant returned back to work, he began to feel ill again. Claimant was sent back for medical assistance. He was diagnosed with acute non-complicated viral pharyngitis—essentially, a head cold.

Under the Executive Decree n°86 this can open indemnification for Mr Mirkovich on a no-fault basis, as an occupational illness.

**Alleged abandonment by Carnival of Mr. Mirkovich when he was ill**

Claimant sustains that the suffering experienced due to Carnival's negligence was exacerbated by their abandonment of him and complete unresponsiveness to requests that Carnival comply with their obligations to provide maintenance and cure.

Actually, Carnival has taken steps, and paid for them, even if Mr. Mirkovich considers them insufficient:

Carnival considers having provided prompt, proper, and adequate medical care as "Immediately upon reporting symptoms to his manager, Claimant was sent to the medical center. *See Claimant's Statement of Claim, page 6.* This was reasonable, as Claimant was showing flu and cold-like symptoms, which normally subside within a few days to a week. He was diagnosed with a viral infection, provided with medication, and told to rest. Because Claimant exhibited symptoms that did not improve, Carnival reasonably had Claimant go to the emergency room at Hospital Mestre del Angel. After being discharged, Carnival paid for Claimant to stay at a hotel.

According to Respondent, Claimant erroneously claims "no accommodations were made" and that "he was required to continue to work." Carnival did not require Claimant to continue to work after becoming aware of his ongoing illness. In fact, Carnival provided Claimant with almost 20 days off work. After Claimant went to the hospital on February 9, 2018, he was given seven days off of work to recover. During this time, Claimant stayed in a hotel in Italy and a nurse regularly checked up on his wellness. Andrew Skiller, Lead Nurse onboard the *Horizon* also visited Claimant while he was staying at the hotel. When Mr. Skiller visited Claimant on February 20, 2019, Claimant stated he was feeling much better.

15

[*See* Correspondence regarding Claimant's Treatment, attached as *Composite Exhibit 8*, bates stamp 19507-14]. Claimant was scheduled to go back to work on February 21, 2019. However, a few days after that he was still not feeling well. Again, Claimant was recommended more time off to recover. At no point did Carnival tell Claimant he would lose his job because of his illness. Rather, Carnival recommended Claimant be sent home on medical leave to recover. [*See id.* at bates stamp 19507-18].

Carnival arranged for Claimant to go home to Macedonia to continue his recovery. [*See id.*]. Carnival continued to coordinate Claimant's medical appointments, including appointments with specialists. [*See id.*; *and see* Carnival Letter to Thomas Miller Claims Management, attached as *Exhibit 9*]. Claimant was seen by both an ENT and a Pulmonologist, the appropriate specialists to assess the respiratory symptoms Claimant was experiencing. On April 2, 2018, Claimant was considered at MMI and was told to avoid areas with dust".

This being said, one evidenced fact that may be construed as an abandonment is the silence Carnival kept several months when Claimant's Counsel asked indemnification, or at least an answer. Indeed, between April, 2018, and April, 2019, eight letters were sent to Carnival on behalf of Mr. Mirkovich demanding payment of maintenance and cure and reimbursement for out of pocket medical expenses. This was admitted by John Mitchell, Esq., in his capacity as Carnival's Corporate Representative, during the Final hearing and may have contributed to negatively impacting the health and psychology of Mr Mirkovich.

**Physical condition of Mr Mirkovich and MMI**

Regardless of potential faults or breaches or Carnival, and regardless of the demonstration of a causation between the conditions of work of Mr Mirkovich and the medical condition he developed, an established fact, documented by the medical file supporting Claimant's Full Statement of Claim, based on scientific measurements, shows that Mr Mirkovich was not at MMI as of April 2, 2018, as had asserted Carnival under the guidance of Thomas Miller Claims Management. During the Final Hearing, John Mitchell, Esq. admitted that after April 2, 2018, Claimant was no longer at MMI and further curative care was required.

From the debates that took place during the Final Hearing, the Tribunal understands that the physical condition of Mr Mirkovich had become, if not totally stabilized, at least chronical.

From Claimant's medical expert himself, Dr. Howard Weiner, a specialist in occupational and environmental therapy, to date Mr. Mirkovich has "persistent, troublesome rhinosinusitis and irritant-induced persistent, moderate/severe asthma."

Furthermore, at page 19 of the Full Statement of Claim can be read about Mr Mirkovich that "now, at age 27, he has been diagnosed with chronic conditions and long term disabilities"

Lastly, on the Gastrointestinal issues, Respondent points out that Claimant's Statement of Claim fails to make a link, through an expert or otherwise, between Claimant's gastrointestinal issues, including GERD and dyspepsia, to any ship-related cause. While a broken ankle from a slip and fall can be readily observed, causes of gastrointestinal issues are not. Claimant cannot link any gastrointestinal issues to anything that happened while working onboard the ship. He did not complain of gastrointestinal issues while onboard. Carnival is not liable for Claimant's medical care related to his claims of GERD or dyspepsia.

**Employment position of Mr Mirkovich**

At the time of Claimant's injury's occurrence at the Fincantieri shipyard, Mr Mirkovich was a Hotel Steward. During his third contract, Mr. Mirkovich completed all the necessary steps and was approved for promotion to bar waiter. He had already started his training for bar waiter and was simply waiting for a position to open which he fully expected to happen during the subject contract aboard the Horizon.

However, such change of position had not been implemented, nor an amendment to the existing contract or a new contract been signed at the time of the occurrence of the injury.

As Hotel Stewart, Claimant was making approximately $634 per month. In the two years that Claimant worked for Carnival, from March 2016 until March 2018, he worked approximately 19.5 months, which amounts to 9.75 months per year. Rounding up to 10 months per year, and multiplying by 10 his monthly wages, Claimant's salary amounts to approximately $6,340 per year ($634 x 10 months).

**Psychological condition of Mr Mirkovich**

The assessment of the psychological condition of Mr Mirkovich essentially relies on Dr Calbeck (Respondent's Exhibit 7), Dr Borislav Knezevic (Claimant's Exhibit 15) and Dr. Sonia Nevistikj (Claimant's Exhibit 16) evaluations and opinions.

Dr Calbeck's report

Further to the cross-examination of Dr Calbeck by Counsel Winkleman during the Final Hearing, Claimant reaches the conclusion that Dr Calbeck's testimony is not credible, as her opinions were based on faulty and unreliable test results, based on tests performed in the English language which is not the mother tongue of Claimant. Mr Mirkovich has a limited English reading comprehension and explicitly reported difficulty understanding the questions he was asked to complete, within an unreasonable time frame, and required the use of a translator.

This information was not provided to Ms. Calbeck, who testified that the test taker needs to be able to comprehend the questions and that use of a translator introduces errors in the responses. Further Ms. Calbeck was not even aware of the unreasonable time limits communicated to Mr. Mirkovich for him to take the tests, and stated that many of her patients take a longer time than the time limits communicated to Mr. Mirkovich.

According to Claimant, Ms. Calbeck's opinions are not credible because she:

- admits that the examinee must be able to understand the questions which are nuanced and contain double negatives;
- admits she failed to administer a WRAT5 test (or any other test) which would show at what level Claimant understands English;
- admits that the use of a translator invites error into the process but in reaching her opinions was not made aware of the fact that Claimant reported he was having difficulty understanding the questions and had to use a translator;
- admits she was unaware that Claimant only had a 50% reading comprehension when tested by Carnival;
- admits that inconsistencies in the PAI test may be due to the fact that English is not Claimant's first language;
- failed to inquire with Carnival as to what Claimant's reading comprehension was;
- did not know there were time limits listed on the tests; and
- failed to advise Claimant he did not have to complete the test within the stated time limits.

This Tribunal agrees with Claimant's arguments as far as the psychological tests of Dr Kalbeck's are concerned: these tests are disqualified by the Tribunal, as is their conclusion that Mr Mirkovich may have exaggerated his medical symptoms. This Tribunal will not retain any results of the tests carried out by Dr Calbeck.

However, the other portions of Dr Calbeck's report, relying on verbal exchanges with Mr Mirkovich, are retained, notably the following:

"I was tortured when I was working on the ship"

"somebody else wanted to destroy me"

"he felt rejected by his mother when he was 14 years old and that his father abruptly left him once he turned 18 years old. He used the language of abandonment when he indicated what his employer ought to do for him while he took sick leave, e.g., "I will never forgive them for how they treated me. When I was sick, I was in the hotel. I left without lunch at the hotel. They should

have arranged for me to soups and tea. They were in a rush. Nobody take care of me. Nobody helped me get my medications. I had to leave the hotel to get my own tea".

These show a particular prism of Mr Mirkovich for reading the events that took place at the Fincantieri shipyard, possibly due to his prior personal history. This explanation is useful for this Tribunal to get a grasp on the connection of the alleged psychological sufferings Mr Mirkovich claims indemnification of, and the illness actually developed during his employment with Carnival.

Dr Knezevic's report

Dr. Borislav Knezevic is the psychologist who has treated Claimant since August 29, 2018.

Dr. Knezevic diagnosed Mr. Mirkovich with PTSD, depression, anxiety, panic attacks and social phobias. He opined that Claimant's illness "is a direct result form the stressful and unsafe working conditions and inappropriate medical treatment." He further opined that Claimant is not at MMI, from a psychological point of view, and requires years of future ongoing medical care.

There is a fundamental issue with Dr Knezevic's approach as the debates during the Final Hearing have established. Beyond the anecdotic fact that Mr Knezevic, displays the title of "entrepreneur" on his headed notepaper, has been evidenced a business and financial interest – as duly highlighted by Respondent - in the outcome of the present litigation, invoicing not only psychological treatment but also full accommodation at the Sokobanja facility operated directly or indirectly by Mr Knezevic. Indeed, it appears that Dr Knezevic is waiting to be paid based on the outcome of this case as if he had a vested interest [see Final Hearing Transcript, Dr. Knezevic, p. 327-328].

Furthermore, as demonstrated by Respondent, Dr. Knezevic, showed no objective evidence of testing that could relate Claimant's psychological symptoms to the ship, relying on Claimant's own assertion that there is a connection. Respondent points that Dr Knezevic used techniques that do not have validity scales, are not used as diagnostic tools when an objective diagnostic testing is required in order to diagnose a trauma or psychological disorder.

Instead, as underlines Respondent, there is evidence of trauma in Claimant's past that would likely support a link to his psychological symptoms, such as his strained relationship with his family and parental abandonment. Dr. Knezevic did not keep the raw data of his testing, making it impossible for this Tribunal to consider the actual testing and results themselves.

The Tribunal does not negate nor minimize the suffering of Mr Mirkovich and the everyday challenge to become combative again, and the Tribunal considers this as a fact to the date of the Final hearing, but due to the lack of objectivity of the medical elements provided by Dr Knezevic cannot conclude to a psychological state of Mr Mirkovich, including an alleged PTSD, that would be a consequence of the pulmonary condition.

The psychological pain Mr Mirkovich must have suffered from, being convinced of having been exposed to perils having triggered his illness because of the absence of providing masks on the one hand, and the feeling of abandonment on the other hand, is however not negated and can give rise to an indemnification, as will be discussed below under the legal basis of Article 1644 of the Panama Civil Code.

Dr. Sonia Nevistikj

Claimant also states that his need for psychiatric care is causally related to his employment, as confirmed when he was evaluated by Dr. Sonia Nevistikj on August 9, 2018.

However, at Claimant's Exhibit 16 (page "Claimant 159"), this Tribunal could not read any of such causal relation.

**Conclusion**

On the physical condition of Mr Mirkovich

The Tribunal considers that the fact that Mr Mirkovich symptoms appeared during his work under the Seafarer's agreement at the Fincantieri shipyard give rise to indemnification under Executive Decree n° 86, as an occupational illness.

The chronicity of the physical condition, the permanent nature of the illness is documented, also acknowledged by Mr Mirkovich in his legal writings, leads this Tribunal to consider that Mr Mirkovich can be considered having reached MMI at the moment of the Final Hearing, the demonstration of the psychological condition of Mr Mirkovich being inconclusive as explained above.

About the extension of an indemnification of Article 173 beyond 16 weeks that is disputed by Respondent, no legal opinion or case law under Panamanian laws have been provided to this Tribunal by Respondent to counter this extension beyond 16 weeks.

Therefore, this Tribunal considers that Carnival's duty to provide Claimant with treatment ended not on April 2, 2018, nor sixteen weeks as of the date on which the injury took place or the start of the illness, but at the time of the Final Hearing where is documented the chronicity of the physical condition of Mr Mirkovich.

About a disability of Mr Mirkovich deriving from the chronicity of his illness, Respondent demands that Claimant receives not more than 30% of his yearly salary, "Pursuant to Article Four".

On the psychological condition of Mr Mirkovich

The psychological aspects of the damage Mr Mirkovich claims indemnification of cannot be retained by this Tribunal as being an occupational illness.

3) **Carnival's potential liability under Articles 1644 and 1645 of the Panamanian Civil Code (Tort Claim)**

A – In law

The "vicarious" liability of Article 1645 has already been discussed in IX-1 above, leading to the conclusion that Carnival endorses the potential liabilities of Fincantieri's employees and agents towards Mr Mirkovich.

In his legal opinion (Exhibit 17), Attorney Francisco Carreira- Pitti explains that such article sets an inversion of the burden of proof to the defendants to show the diligence of a good parent to prevent the damage. The understanding of this Tribunal is that this can relate (at least for parents towards their children) to the presumption of a fault, which is not a presumption of causality.

Article 1644 of the Panamanian Civil Code states:

"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.
Si la acción u omisión fuere imputable a dos o más personas, cada una de ellas será solidariamente responsable por los perjuicios causados."

Which translates as follows:

"Whoever, by action or omission, causes damage to another, by fault or negligence, is obliged to repair the damage caused.

Article 986 of the Panamanian Civil Code states:

> « Quedan sujetos a la indemnización de los daños y perjuicios causados los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas ».

> "Those who in compliance with their obligations incur willful misconduct, negligence or default, and those who in any way contravene these, are subject to indemnify for the damage caused".

There are therefore three cumulative criteria that must be met to trigger the liability of Carnival on the basis of Article 1644 of the Panamanian Civil Code: (1) the suffering of an injury, (2) the injury being a result of the negligent conduct of the shipowner, and (3) direct causation between the damage and the negligent conduct.

On the tort law aspects, Respondent expresses:

- That Mr Mirkovich is not entitled to punitive or moral damages because U.S. General maritime Law does not govern these proceedings and that punitive damages are not available under Panamanian law.

  Panama allows for the recovery of material and moral damages if tort liability is established. Material damages are only recoverable to the extent they are reasonable. Many of the damages in Claimant's "Damage Summary" are not—including past and future "Pain & Suffering, Disability, Physical Impairment, Disfigurement, Mental Anguish, Inconvenience, Loss of Capacity for Enjoyment of Life," past and future medical expenses that are unrelated to illnesses while Claimant was onboard the ship, and punitive damages. Claimant is not entitled to moral damages. Even if Claimant's punitive damages claim was considered under the "moral damages" standard (which this Tribunal should not consider it as such), Claimant's request for damages far exceeds anything that would ever be awarded under Panamanian law.

- That Mr Mirkovich failed to mitigate his damages as smoking is related to the causation and worsening of symptoms of both asthma, respiratory issues, and gastro-intestinal issues. Therefore, Carnival should not be liable for any continuing symptoms Claimant is experiencing. Carnival provided Claimant with the adequate medical care required under Panamanian law. Carnival is not liable for any symptoms Claimant may continue to have because of his own negligence.

Lastly, in law, Carnival explains that any compensation received as a consequence of a tort action should be discounted by the amount received pursuant to a labor (contractual) claim. [Resolution No. J.D. No. 017-2005]. In other words, Claimant is not entitled to double compensation for the same injury.

### B – In fact

Claimant argues that Carnival has been negligent in (1) failing to provide Mr Mirkovich with safe working conditions and proper personal protection equipment; (2) requiring him to work unreasonably long hours without sufficient rest; (3) requiring him to work while exposed to the elements and other environmental factors, without proper and sufficient equipment and assistance to perform his job duties in a reasonably safe manner; (4) failing to protect his health and requiring him to return to work while ill with the threat of termination if he failed to do so; (5) failing to have effective safety and health programs in place, including measure to reduce and prevent the risk of exposure to damaging levels of environmental factors; (6) failing to provide him with full and complete medical care until he reached MMI for all of his conditions, and (7) failing to provide him with payment of indemnity for his long-term disability.

The facts deemed relevant under the provisions of Articles 1644 and 1645 of the Panamanian Civil Code are the following:

### 1.    Pertaining to a breach, fault or negligence of Carnival

**Did Carnival provide an adequate training regarding safety at work?**

Mr Mirkovich benefitted from safety trainings directly performed by Carnival for his three previous employment contracts with Carnival.

But for the last contract, if Mr Mirkovich acknowledged that a safety training organized by Fincantieri did actually take place, the content of such training is disputed as to the specificities of risks of exposure to chemical products, dusts and other elements that can be found in a shipyard. Mr Mirkovich explained that the training at Fincantieri shipyard essentially consisted in learning how to move on the shipyard when cranes are carrying containers overhead, etc.

It is a fact that the Carnival Horizon vessel was not finished, this is documented by the photographs provided by Claimant. The possibility of an exposure to toxic particles or dust cannot be excluded.

The documents remitted are by Carnival are brochures on PPE equipment. No content of the safety training has been provided. No signature of attendance to the training at the Fincantieri shipyard has been provided.

This constitutes a breach of the Shipowners obligations under article 1644 of the Panama Civil Code.

**Did Carnival provide, directly or through Fincantieri, masks protecting against toxic elements that can be identified in a shipyard?**

Carnival brings no concrete evidence of the remittance of protective masks, either paper masks or, more adequately, FFP masks. Actually, the remittance would not have been for a single mask, but many of them, with guidance as to the timing of replacement (as the Covid times have taught us). The evidence of the remittance of such masks could not be brought by Carnival.

As Claimant points out in his post-hearing Brief, "Carnival put on no evidence, other than a self-serving affidavit from John Mitchell (a lawyer for Carnival for 21 years), and presented no fact witnesses and no documentary evidence to show that Personal Protective Equipment ("PPE") was provided to Mr. Mirkovich. Claimant further testified that he expressly asked for such protection(s) but was not given any such protection until after he was already harmed from the exposure(s)". Moreover, Claimant's testimony was substantiated by two fact witnesses: Stefan Kotur and Andela Vukcevic.

At the shipyard, Carnival adopted Fincantieri's Safety Manual which warned about the dangers of dust, fiber and chemical pollutants and the need for PPE.



Employers must identify all activities that produce hazardous chemical pollutants, and make sure that all primary prevention measures are in place to eliminate such pollutants at the source.

At the Final Hearing Carnival presented no fact witness, documentation or evidence to show that Carnival did anything to comply with the clear directives from the shipyard safety manual. Carnival presented no evidence to show that it (or anyone) identified hazardous chemical pollutants and took any prevention measures to eliminate the dangers inherent to an active construction site with its dust, fumes, gases and vapors.

This constitutes a breach of the Shipowners obligations under article 1644 of the Panama Civil Code.

**Did Carnival provide, directly or through Fincantieri, equipment protecting against meteorological elements to be found in a shipyard?**

Claimant claims his respiratory issues, asthma, and gastro-intestinal problems resulted from the work environment he experienced while working onboard the ship. Although it may be common to catch colds in the winter-time, Respondent explains that this is no fault of Carnival and that in fact, Carnival took action to protect Claimant from the rain and cold weather by providing him with a winter jacket even though his duties were primarily indoors.

Mr Mirkovich acknowledged having received a jacket and shoes, Carnival cannot therefore be held in breach of its obligations as regards offering a protection to the Seafarer against the meteorological elements to be found in a shipyard.

Carnival is therefore not considered in breach to that regard.

**Had Carnival to provide, directly or through Fincantieri, equipment protecting against common viruses or diseases?**

In the pre-covid world, the use of masks against common viruses was not imposed nor regulated. By opposition to the requirement of a protective mask against toxic substances that may be found in the shipyard, Respondent had, at the time of occurrence of Mr Mirkovich' illness, no duty to provide protection such as masks against common illnesses or viruses.

Carnival is therefore not considered in breach to that regard.

**Did Carnival provide prompt, proper, and adequate medical care when appeared the medical symptoms of Mr Mirkovich?**

Carnival explains and documents having provided prompt, proper, and adequate medical care as "Immediately upon reporting symptoms to his manager, Claimant was sent to the medical center. *See Claimant's Statement of Claim, page 6.* This was reasonable, as Claimant was showing flu and cold-like symptoms, which normally subside within a few days to a week. He was diagnosed with a viral infection, provided with medication, and told to rest. Because Claimant exhibited symptoms that did not improve, Carnival reasonably had Claimant go to the emergency room at Hospital Mestre del Angel. After being discharged, Carnival paid for Claimant to stay at a hotel.

It would therefore be inaccurate to assert that no accommodations were made and that Mr Mirkovich was required to continue to work.

Carnival provided Claimant with almost 20 days off work. After Claimant went to the hospital on February 9, 2018, he was given seven days off of work to recover. During this time, Claimant stayed in a hotel in Italy and a nurse regularly checked up on his wellness. Andrew Skiller, Lead Nurse onboard the *Horizon* also visited Claimant while he was staying at the hotel. When Mr. Skiller visited Claimant on February 20, 2019, Claimant stated he was feeling much better. [*See* Correspondence regarding Claimant's Treatment, attached as *Composite Exhibit 8*, bates stamp 19507-14]. Claimant was scheduled to go back to work on February 21, 2019. However, a few days after that he was still not feeling well. Again, Claimant was recommended more time off to recover. At no point did Carnival tell Claimant he would lose his job because of his illness, states Respondent. Rather, Carnival recommended Claimant be sent home on medical leave to recover and continued to coordinate Claimant's medical appointments, including appointments with specialists. Claimant was seen by both an ENT and a Pulmonologist, the appropriate specialists to assess the respiratory symptoms Claimant was experiencing.

Lastly, on June 13, 2018, Mr. Mirkovich was admitted to the hospital where he underwent a tonsillectomy. He was hospitalized for two days and Carnival paid for these expenses.

This Tribunal retains that Carnival provided due care to Mr Mirkovich until August 2018.

**Conclusion**

It is documented Carnival provided equipment to protect Mr Mirkovich against the weather conditions that can be met on a shipyard, and provided prompt medical care as soon as the symptoms of Mr Mirkovich appeared. No breach is retained on that ground.

Carnival did not have a duty of providing Mr Mirkovich with protective equipment against common illness or viral infections.

However, Carnival could not document nor evidence the remittance of masks (several of them, adapted to the context of a shipyard, like FFP masks for example), nor could Carnival document the identification of the toxic substances that may have been present at the shipyard. A breach of Carnival is retained on that ground.

### 2.    Pertaining to a causation link between the damage and the negligence

Claimant develops an argumentation on the causal relationship of Claimant's physical conditions essentially based on the report of Dr Weiner,

Claimant also bringing the logical argument that in his testimony, Respondent's expert Dr Parker opined that Claimant had "genetic predisposition", admitting that such a condition could lay dormant and become activated by a viral exposure like the one Mr Mirkovich had in the shipyard.

A nuance is to be brought about a viral disease, which differs from a damage caused to Mr Mirkovich health because of toxic substances, remembering as mentioned above that in the pre-Covid world the use of masks against common viruses was not imposed nor regulated. Also that at demand of Claimant, Dr Parker's new elements of testimony have been stricken by this Tribunal.

Dr. Howard Weiner causally related Claimant's physical conditions to his employment with Carnival and is of the opinion that Mr Mirkovich' symptoms started shortly after having begun his contract on 1/13/18 and, characteristically for an ongoing toxic exposure, worsened at worked while getting less relief when at his hotel each evening. It is likely that gases and/or vapors and/or fumes and/or dusts were generated to levels resulting in an inflammatory response of his respiratory tract and mucus membranes of his eyes, resulting in respiratory diseases and ocular discomfort.

Dr. Howard Weiner concludes that he is of the impression that Mr. Mirkovich has persistent, troublesome rhinosinusitis and irritant-induced persistent, moderate/severe asthma; that these conditions are temporally related to his recurrent irritant/toxic inhalational workplace exposures on Carnival Horizon shortly after 1/13/18. Further, these conditions are consistent with the gases and/or vapors and/or fumes and/or dusts to which he was exposed while not wearing personal protective equipment and support the diagnoses of RADS/irritant-induced asthma and RUDS/chronic rhinosinusitis.

As a consequence, Claimant alleges Carnival must pay to treat Mr Mirkovich respiratory and psychological treatment.

On the contrary, Respondent sustains that there is no credible evidence that Claimant's ailments are linked to his work onboard the *Carnival Horizon*, and that Claimant's experts have no evidence linking a particular occupational exposure to Claimant's symptoms, that Claimant fails to show causation between his alleged injuries and any act of Carnival while working onboard the vessel.

The Tribunal states that the two medical experts reports, Dr Weiner's and Dr Parker's, both lack an objective determination of the origin of the illness (virus, bacteria, toxic substances).

The medical condition of Mr Mirkovich could be rooted in exposure to toxic substances, but also in weather conditions, spreading of diseases, exposure to viruses etc. It is reminded that on February 9, 2018, Mr Mirkovich had been diagnosed with acute bacterial pharyngitis in flu syndrome.

Indeed, an illness caused by an exposure to weather condition would not trigger the responsibility of Carnival as it had remitted protective equipment – jacket, shoes – to Mr Mirkovich.

Furthermore, other colleagues did not suffer from the same harm despite being exposed to the exact same conditions. (From Claimant post-hearing Brief: two fact witnesses: Stefan Kotur and Andela Vukcevic. Both of them testified that the working conditions in the shipyard were "horrible" as they were exposed to cold, dirt, debris and fumes from welders, carpenters and painters. Like Mr. Mirkovich, they would have black mucus when they blew their noses.)

The issue here is that the reports of the medical experts chosen by both parties do not distinguish between the possible causes of Mr Mirkovich physical condition.

It is to be noted that a pulmonary antecedent of Mr Mirkovich is documented: he suffered from an upper respiratory infection in March, 2017. Under the "egg shell skull principle" invoked by Claimant, this would have no impact on Carnival's responsibility.

Actually, the illness of Mr Mirkovich is retained by this Tribunal, so the potential responsibility of Carnival rather lies in the causation and on the protective measures taken in accordance with the duties of a shipowner.

It is also to be noted that further antecedents of Mr Mirkovich (pollution in Skopje) are not in the scope of the debate as not raised by Respondent in a timely manner and in an adversarial manner enabling Claimant to reply on that point within the framework set by the NAM Rules.

Importantly, Dr Weiner concludes by qualifying his opinion as "impressions", stated within a degree of reasonable certainty, which are subject to change based upon review of additional information.

Respondent's medical expert's report (Dr Parker, Respondent's Exhibit 5) is also expressing opinions rather than medical certainties. For example, the conclusions reached by Dr Parker on the fact that Mr Mirkovich was smoking 4 or 5 cigarettes a day are not based on examinations, samples or scientific basis, and will as such not be retained by this Tribunal.

Essentially, elements enabling this Tribunal to establish on an objective basis a causal link between pollutants and the damages suffered by Mr Mirkovich (toxicology reports, identification of certain pollutants or toxic materials as the cause of the illness, measurements of sequels of levels of toxic exposure on organs, persistence of toxic traces in the body, identification of the exact pollutants at stake etc.) could not be provided in support of Claimant's Claims. The Tribunal realizes the difficulty to have such elements provided (given as examples and not exclusive of other means of evidence), but the establishment of a causal link between the alleged toxic exposures and the conditions developed by Mr Mirkovich cannot be based, to entail legal consequences, only on contradicting opinions of the Parties' medical experts.

### C - Conclusion

As to the breaches

A breach of Carnival's obligations - by negligence for having exposed Mr Mirkovich to a risk of toxic exposure - is retained because the remittance of a protective mask (disposable dust mask, filtering mask, FFP mask) and proper training have not been evidenced by Carnival.

But no breach is retained for the physical condition of Mr Mirkovich that could be deriving from weather conditions on the shipyard, because a specific equipment had been remitted to Mr Mirkovich, nor for an illness rooted in common diseases or viruses, for which no breach of Carnival could be retained.

As to the causation

The occurrence of a risk or the concomitance of the damage with the period of employment by Carnival is however not sufficient to establish causation under the letter of article 1644 of the Panamanian Civil Code. Concomitance is not causation indeed.

A strong belief or impression is not proving causality as synthetically expressed by article 1644 of the Panama civil code.

The incomplete, subjective aspects and contradictory conclusions of the reports of the respective medical experts of Mr Mirkovich and Carnival, expressing opinions and impressions rather than scientific conclusions, do not enable this Tribunal, on the strict basis of article 1644, to conclude that a causation is ascertained between the breach and the damage suffered by Mr Mirkovich.

Objective measurements such as, for example, toxicology reports, identification of certain pollutants or toxic materials as the cause of the illness, measurements of sequels of levels of toxic exposure on organs, persistence of toxic traces in the body, identification of the exact pollutants at stake etc. could not be provided in support of Claimant's Claims.

This Tribunal is aware of the various dimensions of the causality and of the difference between physical or medical causation and legal causation as retained by the tribunals of different countries as illustrated below.

But, to take its decision, this Tribunal has only been provided as legal basis with the text of article 1644, explained by Mr Carrera-Pitti, but not in a way allowing the Tribunal to depart from the letter of article 1644 which, literally, requires an evidenced causation.

To accept and enforce a more victim-orientated more flexible concept of causation, this Tribunal would have needed laws or case law ascertaining such flexible causation in the interest of the victim, under Panamanian laws. This Tribunal does not know if such is the position of the Panamanian legal system and judicial decisions, as this Tribunal relies on the parties, in the field of an adversarial legal debate, to obtain visibility on the Panamanian laws and case law.

As a consequence, the tort liability of Carnival under the Civil Code of Panama and more particularly its article 1644 is rejected for lack of evidenced causation between the damages suffered by Mr Mirkovich and the breach of Carnival consisting in not having supplied adequate protective masks on a timely manner.

For the sake of reasoning, in the field of comparative law, in English law, the standard of proof required for the recognition of a causal link is based on the balance of probabilities. In French law, the causal link must be certain and direct, save when specific regulations have been passed, or supreme court case law adopted, to ease the burden of the proof of causation, for example in asbestos, Aids and also pharmaceutical (DES – Diethylstilbestrol) contamination files.

The Panamanian legal system is derived from the "latin" systems like France, therefore, failing to have other legal elements provided by the parties (specific laws lightening the causation to be proven, case law, other regulations etc.), this Tribunal cannot, by itself, depart from the strict causation set by article 1644 of the Panamanian Civil Code. At the national level, the dilemma is to either ease the indemnification of damages suffered even when a scientific causation is very difficult to bring, or to preserve a high degree of legal and judicial security, or rather predictability, by maintaining the requirement of evidencing a strict causal link. The role of this Tribunal is not to take position between these two landmarks, but to apply the Panamanian laws as objectively documented by the Parties.

As a result, the causation between Carnival's breaches and the physical damages suffered by Mr Mirkovich is not retained by this Tribunal. This Tribunal cannot conclude to a certain causation between the conditions of work in the shipyard and the medical condition developed by Mr Mirkovich.

One causation is however retained by this Tribunal, on the specific fact that Mr Mirkovich can have suffered a psychological harm from the fact of not having been in a position to be protected by a mask, also to have felt ignored and abandoned at the time of the repeated written demands of his Counsel, to Carnival.

*

## XI – AWARD

- Considering that Mr Mirkovich was employed by Carnival to work at the Fincantieri shipyard in Italy;
- Considering that it is medically documented that Mr Mirkovich developed symptoms of respiratory illness while working at the shipyard;
- Considering that in terms of risks, Carnival did not prove the content of the safety training nor the remittance of protective masks;
- Further considering that the conflicting medical opinions of the Parties' respective experts, Dr Weiner and Dr Parker, express irreconcilable views on the basis of hypothesis, lacking scientific certainty or conclusiveness;
- Considering, for past medical psychologic care, that only a portion of such expenses corresponds to actual medical treatment, the other portion corresponding to accomodation on the Sokobanja facility being outside of the scope of the Panamanian Executive Decree n°86.
- Considering about MMI under the Executive Decree n°86 – in the meaning of physical symptoms – that the opposing views of the parties and their expert does not allow this Tribunal to determine that Mr Mirkovich reached MMI in April 2020, but that the exchanges during the Final Hearing made this Tribunal understand the chronicity, established at the latest at the date of the Final Hearing (20 July 2021), of the asthmatic and respiratory condition of Mr Mirkovich, equipollent to MMI and possibly constituting a disability under Panamanian laws.
- Considering that Mr Mirkovich psychological condition developed after his repatriation and appears to be for a substantial part rooted in his personal history rather than attributable to Carnival.
- Considering however, on tort aspects, that Mr Mirkovich can have suffered a psychological harm from the fact of not having been in a position to be protected by a mask, also to have felt ignored and abandoned at the time of the repeated written demands of his Counsel to Carnival.

**In light of the above, I rule and direct that**

**Under Panamanian law, Executive Decree n°86:**

In addition to the medical and repatriation costs already borne by Carnival, which are maintained;
Respondent is condemned to pay:

Medical care, expenses and compensation

- Reimbursement of expenses for past medical care and medication incurred by Mr Mirkovich: USD20,153.71 (twenty thousand one hundred fifty-three USD and seventy-one cents)
- Past psychiatric care from 8/29/18 to 7/12/21: USD30,000 (thirty thousand USD)
- Disability due to the chronicity of the illness of Mr Mirkovich: USD160,000 (one hundred and sixty thousand USD)

Past lost wages: USD45,507 (fourty-five thousand five hundred and seven USD)
Lost earnings in the future: not compensated

**Under Articles 1644 and 1645 of the Civil Code of Panama:**

Pain and suffering, mental anguish and moral damages: USD60,000 (sixty thousand USD)

**Claims under US Law are rejected.**

All other claims are herewith dismissed.

**As to the arbitration costs**

The costs of this arbitration are borne by Carnival, as per article 9 of the Seafarer's Agreement. Each Party shall pay its own costs for legal representation and assistance as per article 9 of the Seafarer's Agreement.

\*          \*

\*

This Award is strictly reserved to the parties and shall not be disseminated, in accordance with the stipulations of article 13 of the Seafarer's Agreement concluded between Mr. Mirkovich and Carnival on 13 January 2018 according to which:

> "Confidentiality. Seafarer and CCL hereby agree to that all information disclosed in connection with arbitration shall not be made public or disseminated by any means. Unless otherwise agreed by the parties in writing, or required by applicable law, the parties, members of the tribunal and the administrator shall keep confidential all matters relating to the arbitration or award. Any party who discloses information in violation of this provision shall be subject to sanctions, including but not limited to vacating the arbitration award, monetary sanctions and imposition of attorney's fees and costs".

Place of Arbitration: Nice, France

Arbitral Award issued on September 16, 2021

The Arbitral Tribunal

Fabien Penvern
Sole Arbitrator
